Filed 12/20/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CORY VIRGIL BAUGH,<br><br>        Defendant and Appellant. | A166277<br><br>(Contra Costa County<br>Super. Ct. No. 04002018133) |

Defendant Cory Virgil Baugh appeals his convictions of sex offenses against two minors.  His principal contention is that the trial court erred and violated his constitutional rights to confrontation, compulsory process, and due process by refusing to order the People to obtain and disclose information as necessary for the defense to investigate whether one of the minors was treated for schizophrenia and to subpoena psychiatric records if they exist.

In the published portion of this opinion, we reject this contention and observe there is no indication the People suppressed evidence in its possession.  In the unpublished portion, we reject defendant's remaining claims pertaining to the rejection of his mistrial motion, the exclusion of certain evidence, prosecutorial error, and cumulative error.  We also address defendant's requests for independent review of subpoenaed law enforcement

---

\*        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts B through G of the Discussion.

records and correction of the probation report. With regard to the law enforcement records, we will conditionally reverse and remand for further proceedings. Finally, in the event the judgment is reinstated, we agree the probation report must be corrected.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged defendant by amended information with: sodomy of a person under the age of 16 (Pen. Code, § 286, subd. (b)(2),[1] count 1); sodomy of an unconscious victim (§ 286, subd. (f), count 2); lewd acts on a 14 year old or a 15 year old at least 10 years younger than defendant (§ 288, subd. (c)(1), counts 3 and 5); and lewd acts on a child under the age of 14 (§ 288, subd. (a), count 4). Counts 1 through 3 involved John Doe 1 (Doe 1), while count 4 involved his younger brother John Doe 2 (Doe 2) and count 5 involved their older sister Jane Doe (Jane). The People further alleged defendant had one prior "strike" conviction (§§ 667, subds. (d)–(e), 1170.12, subds. (b)–(c)), along with a number of aggravating circumstances (Cal. Rules of Court, rule 4.421). The jury trial in August 2022 included the following evidence and testimony.

Doe 1 testified he was 11 or 12 years old when he became friends with defendant, who was then 25 or 30 years old. Doe 1 stayed with defendant off and on in the summer of 2014, when defendant was renting a basement residence in Contra Costa County. An incident occurred one night, sometime between July and the beginning of the school year. In short, Doe 1 and defendant were drinking whiskey and smoking marijuana in defendant's basement residence; both were intoxicated. At some point in the night, Doe 1 fell asleep then awoke to a sharp pain to his anus. Defendant's face was above Doe 1, and he was holding up Doe 1's bent legs. Doe 1 eventually

---

[1]     All further undesignated statutory references are to the Penal Code.

2

realized the pain was caused by defendant's penis. Doe 1 felt panic, kicked defendant away, and ran to the bathroom to "push [defendant's] semen out." Doe 1 could see what he believed was semen. Doe 1 called Jane to pick him up and left immediately; he recalled placing that call at around 4:00 a.m.

Doe 1 told no one of the incident, and he continued to hang out with defendant because he feared losing friends if he did not. In 2017, Doe 1 cut off as many ties to the Bay Area as possible, and left to "move on and grow up." He never confronted defendant about what happened. However, in 2020 defendant showed up at Doe 1's place of work and acted like they were friends; this caused Doe 1 to have a "breakdown" and he was unable to "hold it in anymore." Doe 1 first told his mother, who then pressured him to report it. Though he made the report, he refused to conduct a pretext call. The last time Doe 1 talked to Detective Ruth Talley, who was assigned to investigate the case, his phone ran out of batteries and he never called her back.

Jane testified she met defendant when she was 14 years old, and he was in his early thirties. Doe 1 lived with defendant in the summer of 2014, and she recalled going to defendant's residence twice, once to pick up Doe 1 in the middle to end of 2014. When Doe 1 moved back home, his demeanor had changed from outgoing, smiling, and energetic to reserved and unhappy.

Jane recounted an incident between herself and defendant when she was 14 or 15 years old and went camping with defendant and other friends. After Jane laid down to sleep in the group's tent, she felt defendant lay behind her, put his arm around her, and rub his pelvic area against her while having an erection. After about two minutes, she left the tent to go sleep in defendant's car. Jane testified she never told anyone because she thought defendant was drunk and acted unintentionally. Jane finally disclosed the incident after her brother, Doe 1, disclosed what defendant did to him.

3

Doe 2 testified that around Christmas in 2014, when he was 13 years old, there was a holiday party at his home. Defendant, who was in his thirties at the time, attended the party. Doe 2 fell asleep on a couch, but awoke in the middle of the night to find himself face to face with defendant, whose hand was in Doe 2's boxers and squeezing his buttocks. Defendant appeared to be sleeping because he was breathing heavily and his eyes were closed. This went on for about two minutes. When Doe 2 felt defendant's other hand traveling towards his front side, he "freak[ed] out" and went into another room. When Doe 2 woke up in the morning, defendant was sleeping nearby on the floor. Doe 2 did not tell anyone about the incident until Doe 1 disclosed what defendant did to him. Doe 2 acknowledged telling Detective Talley the incident might have occurred in 2014 or 2015. Doe 2 also recalled a period of time when Doe 1 stayed with defendant, and that when Doe 1 returned home, his demeanor was different.

Defendant's former landlord, who managed the basement residence where the Doe 1 incident allegedly occurred, testified that he and defendant eventually agreed defendant would move out by June 10, 2014, and that defendant did so. Defendant also called two character witnesses who testified that they saw defendant interact with teenagers and never saw anything inappropriate, and that defendant was not a sexual deviant. Finally, at the defense's request, the court took "judicial notice" of the fact that defendant was "unavailable" to commit the alleged crimes from December 4 to December 8, 2014, from November 1 to November 15, 2015, and from November 30 to December 31, 2015.

The jury found defendant not guilty of count 5 concerning Jane, but guilty of all remaining counts. The jury also found true the aggravating circumstances that the victims were particularly vulnerable and that

4

defendant took advantage of a position of trust or confidence to commit the offenses. (Cal. Rules of Court, rule 4.421(a)(3), (11).) The trial court dismissed the prior strike allegation and sentenced defendant to a total of eight years in prison: six years for count 2 and two years for count 4. The court stayed the sentences on counts 1 and 3 pursuant to section 654. This appeal followed.

## DISCUSSION

### A. Discovery

Defendant first contends the trial court should have ordered the prosecutor to "obtain and disclose information sufficient for the defense to investigate whether psychiatric records [of Doe 1] existed and to subpoena them if they did. Then, [the court] could have reviewed the records in camera and disclosed documents it deemed relevant and discoverable for the purpose of cross-examining and impeaching [Doe 1]." He contends the court's refusal to do so violated his state and federal rights to confront witnesses, compulsory process, and due process.

#### 1. Additional Background

Just before jury selection, the defense informed the trial court the prosecutor had disclosed that Jane said Doe 1 had been diagnosed with schizophrenia. Contending the diagnosis was relevant to Doe 1's credibility because hallucinations and delusions can be symptoms of schizophrenia, the defense indicated it would rather not request a "1050,"[2] and asked the court to order the prosecutor to obtain Doe 1's mental health records so the defense could ascertain if they had any relevance.

---

[2] Section 1050 is the statute governing continuances in criminal cases. Continuances can be granted only upon a showing of good cause. (§ 1050, subd. (e).)

5

The prosecution affirmed that Jane mentioned in passing that Doe 1 was diagnosed with schizophrenia at some point after the alleged crime. The prosecution did not ask Jane any follow-up questions about the matter, believing it was not the People's obligation to seek out third party discovery.

Defense counsel indicated, without identifying names, that "they" were unwilling to speak with the defense and argued that the People's failure to "further probe" Jane about Doe 1's diagnosis violated defendant's due process rights. The defense asked the trial court to hold a hearing pursuant to Evidence Code section 402, in which Doe 1 could be asked if he has a mental health diagnosis and whether he has seen a mental health counselor. Alternatively, the defense asked for a continuance.

Noting that Jane's statement constituted hearsay, the trial court agreed the People had no discovery obligation to obtain medical records for the defense. The court disagreed with the defense's argument that the diagnosis was necessarily relevant to credibility, finding it speculative to say that someone with schizophrenia "lies about everything" or would make up the allegations at issue because of delusions. In denying the defense's requests for a section 402 hearing or a continuance, the court explained: "The problem here is that you have not convinced me that a mere diagnosis, even if there is a diagnosis of schizophrenia, means that a person is by virtue of being schizophrenic walks around life every single day of his or her life in a state of delusion. There is absolutely no medical research that's going to back that up and that's essentially your argument, that a person with schizophrenia is always walking around in a state of delusion and that's what I don't buy."

The defense acknowledged there was no evidence that someone who has schizophrenia constantly has delusions, but pressed the trial court to

6

obtain Doe 1's mental health records and review them in camera to see if they contained anything relevant. Though concluding the defense had made no showing of relevance to support even an in camera review, the court left the door open for the defense to present authority to change the court's mind. In so ruling, the court did not purport to prohibit the defense from questioning witnesses generally about Doe 1's ability or inability to accurately perceive and recall events. The defense did not raise the mental health issue again but actively cross-examined Doe 1 about his recollection of the relevant events.

### 2. Analysis

As indicated, defendant contends the trial court should have ordered the People to obtain and disclose information sufficient for the defense to investigate whether psychiatric records existed and to subpoena them if they did. In so contending, defendant focuses principally on the Sixth Amendment right to confrontation and cross-examination and cases such as *People v. Reber* (1986) 177 Cal.App.3d 523 (*Reber*), which apply a balancing test to assess when the psychotherapist-patient privilege must yield to this constitutional right. Indeed, he frames the issue in light of this test, stating, "Whether the court below struck the proper balance is the question presented here," and claims "[t]he court erred by not applying the *Reber* procedure of obtaining the records, balancing the need for disclosure against the privacy interest, determining which records were essential to protect [his] confrontation right and making an adequate record for review."

The fundamental flaw in this argument is that the *Reber* line of cases does not purport to address whether a trial court can or should order the People to develop evidence it does not have or to obtain a witness's mental health records so that impeachment evidence might be uncovered. Rather,

7

*Reber* and its progeny are properly understood as applying a procedure for when a trial court is called upon to examine subpoenaed mental health records in camera to determine which, if any, of the records should be disclosed to the defense.

In *Reber*, the defendants had obtained a subpoena duces tecum to "secure from nonparties medical records relating to psychotherapy administered to the two complaining witnesses." (*Reber*, *supra*, 177 Cal.App.3d at p. 528.) The prosecution moved to quash the subpoena and sought a protective order covering certain records that had already been released to the defendants. (*Ibid.*) The trial court conducted an in camera examination of only some of the records, and issued a protective order precluding further discovery and use of privileged information, but made available all other records "concerning the mental condition of the witnesses which revealed that either had suffered from 'hallucinations or delusions of a severe nature.' " (*Id.* at p. 529.) The *Reber* court found, among other things, that the trial court erred to the extent it failed to examine in camera all the subpoenaed materials. (*Id.* at pp. 528–532.) But *Reber* had no occasion to opine on what duty, if any, the People have to assist the defense by gathering and locating potential impeachment evidence that the People do not possess or have a right to possess.

Most of defendant's other cases similarly involve parties who sought full or partial disclosure of subpoenaed records containing privileged medical or mental health information. (E.g., *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 43-44 (*Ritchie*); *People v. Nieves* (2021) 11 Cal.5th 404, 431; *People v. Gurule* (2002) 28 Cal.4th 557, 587–588 (*Gurule*); *People v. Hammon* (1997) 15 Cal.4th 1117, 1119 (*Hammon*); *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1691, fn. 6; cf. *Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1294, 1297

[though "a witness's credibility is always in issue," the defense is not entitled "to rummage through the medical records of every witness in a criminal prosecution looking for evidence to impeach the witness's credibility"].)  These cases are also off the mark because the trial court here did not refuse to examine any mental health records.  Moreover, defendant wrongly insists that these cases additionally stand for the proposition that, when hearsay about an alleged crime victim's possible psychiatric diagnosis comes to light, a trial court is required to order the People to gather and disclose information sufficient to enable the defense to investigate the existence and whereabouts of their psychiatric records.

Defendant also relies on *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*) and *Davis v. Alaska* (1974) 415 U.S. 308 (*Davis*).  As one court succinctly recognized, however, " '[a] prosecutor's duty under *Brady* to disclose material exculpatory evidence applies to evidence the prosecutor, or the prosecution team, *knowingly possesses or has the right to possess.*' " (*People v. Superior Court* (*Meraz*) (2008) 163 Cal.App.4th 28, 47, italics added.)  Here, defendant makes no attempt to show the information he sought was in the possession of the prosecution or persons acting on its behalf.

Contrary to defendant's suggestion, neither *Brady* nor *Davis* suggests the People have a constitutional duty to assist the defense in obtaining possible impeachment information from a victim or a third party.  In *Davis*, the prosecution moved for a protective order to prevent the defense from referencing a key prosecution witness's juvenile record on cross-examination, including the fact that the witness was on probation as a juvenile delinquent. (*Davis*, *supra*, 415 U.S. at pp. 310–311.)  Relying on state law making juvenile adjudications and orders inadmissible, the trial court issued the

9

protective order. (*Id.* at p. 311, fns. 1 & 2.) The United States Supreme Court reversed, concluding the Sixth Amendment right to cross-examination trumped the state's interest in protecting the confidentiality of a juvenile's record. (*Id.* at pp. 319–320.) Notably, *Davis* did not address whether a trial court could or should order the People to gather information regarding the non-criminal or non-juvenile records of a victim or a prosecution witness that are not in the possession or control of the People.

As the People observe, defendant has identified no legal authority that would have authorized the trial court to order the People to conduct an investigation into Doe 1's alleged diagnosis and potential mental health provider and to provide such information to the defense. Indeed, upon close examination, the cited case law tends to support rejection of his claim.

For instance, *Ritchie*, *supra*, 480 U.S. 39, involved a defendant who subpoenaed and sought pretrial discovery of records in the possession of a child protective service agency concerning the victim of the alleged sex crimes. (*Ritchie*, at p. 43.) There, the Pennsylvania Supreme Court concluded that the defense attorney should have had access to the agency's entire file to search for any useful evidence, and that the trial court denied the defendant his rights under both the confrontation clause and the compulsory process clause in holding otherwise. (*Id.* at p. 46.) The United States Supreme Court granted certiorari to consider "whether and to what extent a State's interest in the confidentiality of its investigative files concerning child abuse must yield to a criminal defendant's Sixth and Fourteenth Amendment right to discover favorable evidence." (*Id.* at pp. 42–43.)

The lead opinion—authored by Justice Powell and joined by Chief Justice Rehnquist, Justice White, and Justice O'Connor—disavowed the

10

Pennsylvania Supreme Court's apparent understanding that *Davis*, *supra*, 415 U.S. 308, indicated a statutory privilege could not be maintained when a defendant asserts a need, prior to trial, for protected information in order to undermine a witness's testimony: "If we were to accept this broad interpretation of *Davis*, the effect would be to transform the Confrontation Clause into a constitutionally compelled rule of pretrial discovery. Nothing in the case law supports such a view. The opinions of this Court show that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. [Citations.] The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses."[3] (*Ritchie*, *supra*, 480 U.S. at pp. 52–53, fn. omitted.)

The *Ritchie* court declined to address whether the failure to order disclosure of the agency records violated the Sixth Amendment's compulsory process clause, explaining that "the applicability of the Sixth Amendment to

---

[3]     In dissent, Justice Brennan joined by Justice Marshall disagreed with the lead opinion's reading of the confrontation clause, arguing that "cross-examination may be restricted . . . through preclusion at trial itself of a line of inquiry that counsel seeks to pursue," but it can also be foreclosed "by the denial of access to material that would serve as the basis for this examination." (*Ritchie*, *supra*, 480 U.S. at p. 67.) In a concurring opinion, Justice Blackmun also wrote separately to assert his disagreement with the plurality's conclusion that the confrontation clause "protects only a defendant's trial rights and has no relevance to pretrial discovery" and to express agreement with Justice Brennan's dissent. (*Id.* at pp. 61–62.) Notwithstanding the possible merits of these dissenting views, we shall defer to the plurality's general understanding of the reach of the confrontation clause.

this type of case is unsettled, and . . . our Fourteenth Amendment precedents addressing the fundamental fairness of trials establish a clear framework for review." (*Ritchie*, *supra*, 480 U.S. at pp. 55–56.) Discussing the government's *Brady* obligation to turn over favorable and material evidence in its possession, *Ritchie* concluded the defendant was entitled to have the agency's records reviewed by the trial court, and the court could do so in camera. (*Id.* at pp. 57–60.)

After *Ritchie*, the California Supreme Court issued *Hammon*, *supra*, 15 Cal.4th 1117, a molestation case where the defendant served subpoenas on psychotherapists who treated the victim, his foster child. (*Hammon*, at pp. 1119–1120.) In granting the prosecutor's pretrial motion to quash the subpoenas based on the victim's psychotherapist-patient privilege, the trial court refused to review the records in camera. (*Id.* at pp. 1120–1121.) The California Supreme Court upheld that refusal, rejecting the defendant's reliance on *Reber* and its progeny. In the words of the *Hammon* court, the *Reber* line of authority incorrectly "believed the confrontation clause of the Sixth Amendment . . . , as interpreted in *Davis v. Alaska* (1974) 415 U.S. 308 . . . , required pretrial disclosure of privileged information when the defendant's need for the information outweighed the patient's interest in confidentiality. In authorizing disclosure before trial, however, *Reber* went farther than *Davis* required, with insufficient justification." (*Hammon*, at pp. 1122–1123.)

Specifically, the *Hammon* court explained that *Davis*, *supra*, 415 U.S. 308 "involved a defendant's *trial rights* only" when holding that "a defendant could not be prevented at trial from cross-examining for bias a crucial witness for the prosecution, even though the question called for information made confidential by state law." (*Hammon*, *supra*, 15 Cal.4th at p. 1124.) As

12

*Hammon* explained, *Reber*'s assumption that *Davis* permitted a defendant to obtain *before trial* any information he would be able to obtain *at trial* was rendered questionable after *Ritchie*, *supra*, 480 U.S. 39. (*Hammon*, at p. 1124.) On the record before it, *Hammon* declined to "extend the defendant's Sixth Amendment rights of confrontation and cross-examination to authorize pretrial disclosure of privileged information." (*Id*. at p. 1128.) Though the California Supreme Court indicates this remains an open question (see *People v. Abel* (2012) 53 Cal.4th 891, 930–931), we see no need to weigh in on that issue because the question here is whether the trial court erred in refusing to order the People to gather and provide information to the defense regarding an alleged crime victim's mental health and possible psychiatric treatment. In any case, both Doe 1 and Jane took the stand during trial, and the trial court did not foreclose the defense from confronting and cross-examining either of them about the topic. (See discussion, *post*, at pp. 17–18.) Nor did the court prohibit the defense from cross-examining Doe 1 about his perception and recall of events.

Defendant's reply brief belatedly cites *People v. Coyer* (1983) 142 Cal.App.3d 839 (*Coyer*) and *In re Littlefield* (1993) 5 Cal.4th 122 (*Littlefield*) for the propositions that (i) information in the prosecution's possession and control encompasses information that is reasonably accessible to the prosecution, and (ii) information that is readily available to the prosecution and not the defense is subject to disclosure by the prosecution. Defendant then argues "pertinent identifying information about the location of records that would shed light on Doe 1's diagnosed mental illness was 'reasonably accessible' and 'readily available' to the prosecution since all it needed to do was ask Doe 1 about it."

Defendant fails to show good cause for tardily presenting these authorities. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. 10.) Nor does he specifically discuss how *Coyer* and *Littlefield* support his position. "We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

In any event, *Coyer* and *Littlefield* provide no basis for concluding the trial court erred or abused its discretion in failing to order the People to gather the requested information in preparation for the trial. (*Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 359 [discovery orders in criminal cases reviewed for abuse of discretion].)

In *Coyer*, *supra*, 142 Cal.App.3d 839, the defendant sought a list of pending criminal charges for the prosecution witnesses. (*Coyer*, at p. 842.) The trial court declined to order the requested discovery, stating defense counsel could discover any charges pending in Solano County through "court indexes." (*Ibid.*) In holding the trial court abused its discretion in refusing to order the prosecutor to furnish the requested list, the Court of Appeal emphasized "the pendency of criminal charges is material to a witness' motivation in testifying even where no express 'promises of leniency or immunity' have been made" and further noted there was no claim of privilege. (*Id.* at pp. 842–843.) And notably, *Coyer* observed that the prosecution could easily compile the requested list of pending charges but that there existed "no similarly expedient method" by which defense counsel could do so. (*Ibid.*)

Here, defendant was not seeking a list of criminal charges pending against Doe 1. Rather, defendant sought information related to Doe 1's mental health and possible psychiatric treatment. But the record falls short

14

of establishing that this information was unavailable to the defense. Though defense counsel summarily represented that "they" were unwilling to speak with the defense, counsel did not identify who was unwilling and offered no other facts indicating the defense could not obtain the information through reasonable investigative efforts. Moreover, defendant posits the information was reasonably accessible and readily available to the People because "all [the People] needed to do was ask Doe 1 about it." But unlike the situation in *Coyer*, where the People had ready access to information about pending criminal charges against their witnesses while the defense had no similar means of access, records of a witness's "voluntary treatment by private and county therapists" are "not generated or obtained by the People in the course of a criminal investigation," and the People have "no greater access to them than defendant." (*People v. Webb* (1993) 6 Cal.4th 494, 518.)

Nor does *Littlefield*, *supra*, 5 Cal.4th 122, impose an obligation on the People to gather or develop such information for the defense. In contrast to the instant case, *Littlefield* held the reciprocal criminal discovery statutes (§ 1054 et seq.) authorized the sanction of contempt "for the refusal by defense counsel to comply with an order to acquire the address of a person whom the defense intends to call as a witness at trial, where that address is reasonably accessible." (*Littlefield*, at pp. 129, 137.) In reaching this conclusion, the high court construed section 1054.3 as requiring "the defense to provide the prosecution with the names and addresses of prospective defense witnesses to the extent this information is known to, or reasonably accessible to, the defense." (*Id.* at p. 131.)

In holding that sections 1054.1 and 1054.3 "require both the prosecution and the defense to disclose the names and addresses of persons whom they intend to call as witnesses at trial, if such information is known

15

or is reasonably accessible," *Littlefield* was quite clear in acknowledging that "the prosecution has no general duty to seek out, obtain, and disclose all evidence that might be beneficial to the defense." (*Littlefield*, *supra*, 5 Cal.4th at pp. 135–136, italics omitted; cf. *United States v. Hansen* (11th Cir. 2001) 262 F.3d 1217, 1234–1235 [no *Brady* violation where there was no showing the prosecution actually possessed impeachment evidence concerning its expert witness]; *United States v. Portillo* (5th Cir. 2020) 969 F.3d 144, 182 [no *Brady* violation where there was no showing the prosecutor's team had access to a witness's psychiatric records].) Here, the People provided the defense with the names and contact information of Jane and Doe 1, among others; no more was required.

Though we reject defendant's claims of error,[4] our decision should not be read as suggesting agreement with the trial court's apparent view that evidence of an alleged victim's schizophrenia is never relevant unless the defense can show it causes the person to lie constantly or to make up allegations because of delusions. Although "psychiatric material is generally undiscoverable prior to trial," it is also true that "mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*Gurule*, *supra*, 28 Cal.4th at pp. 591–592; see *Reber*, *supra*, 77 Cal.App.3d at p. 530 [the veracity of someone "with a psychosis such as paranoid schizophrenia may be impaired by distortions in his ability to perceive and

---

[4] Defendant also makes a due process claim that similarly focuses largely on the Sixth Amendment and faults the trial court for "not applying the *Reber* procedure." Likewise, defendant invokes *Brady* but again makes no attempt to show the People suppressed evidence in its possession. These contentions are unavailing for the reasons already stated.

recall events; a schizophrenic who suffers delusions and hallucinations may have difficulty distinguishing fact from fantasy"].)  Under different circumstances—e.g., had the defense actually subpoenaed Doe 1's mental health records—the *Reber-Hammon* line of cases would have required the trial court, at a point during the trial when the court could meaningfully assess the materiality of the evidence at issue, to review those records in camera and properly balance defendant's need for cross-examination against the state policies the privilege is intended to serve.  (*Hammon*, *supra*, 15 Cal.4th at p. 1127.)  Here, however, there were no medical records for the trial court to examine and defendant has not identified a valid basis for requiring the People to obtain information leading to the location of the victim's medical records as part of any prosecutorial obligation imposed under constitutional, statutory, or case law.

"Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses."  (*Ritchie*, *supra*, 480 U.S. at p. 52.)  Defendant, however, did not cross-examine Doe 1 about his mental health or whether he had any history of delusions.  Nor did he even seek to do so, despite statutory and case law that would have permitted such questioning.  (See, e.g., Evid. Code, § 780 ["the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing"]; *People v. Herring* (1993) 20 Cal.App.4th 1066, 1072 ["witness may be cross-examined about her mental condition or emotional stability to the extent it may affect her powers of perception, memory or recollection, or communication"]; see also *Abel*, *supra*, 53 Cal.4th at p. 929 ["During cross-examination, defense counsel asked Ripple if she had any history of mental health treatment"].)  Though the trial court refused defendant's request to

impose a novel information-gathering burden on the People based on Jane's hearsay reference to Doe 1's supposed schizophrenia, there is no reason to believe the court would have foreclosed the defense from cross-examining Doe 1 on the stand about his mental health in an effort to show its relevance to his credibility.

In closing, we address the dissent's view that the trial court erroneously refused the defense's request to hold an Evidence Code section 402 hearing, specifically so that the defense could ask Doe 1 directly if he had been diagnosed with schizophrenia and, if so, where his psychiatric records could be located.  (Dis. opn. at pp. 1, 4, 6, *post*.)  Notably, defendant has not raised or briefed this perceived error on appeal, and his appellate briefing mentions Evidence Code section 402 only twice in passing when setting out the procedural background of his claim.  In an effort to overcome this omission, the dissent overlooks the issues that defendant in fact raises on appeal, which are—and we quote—that "[t]he court should have ordered the prosecution to obtain and disclose information sufficient for the defense to investigate whether psychiatric records existed and to subpoena them if they did" and that "[t]he trial court erred by not applying the *Reber* procedure of obtaining the records, balancing the need for disclosure against the privacy interest, determining which records were essential to protect Baugh's confrontation right and making an adequate record for review."  Because " '[i]ssues do not have a life of their own' " and are forfeited if not raised or properly briefed on appeal (*City of Eureka v. Superior Court* (2016) 1 Cal.App.5th 755, 765), we see fit to limit our decision to the issues actually presented by defendant.

Though we offer no opinion on the merits of the dissent's conclusions, we question whether there is a logical limiting principle to cabin the dissent's

18

view that Evidence Code section 402 provides defendants with a means of extracting pretrial testimony and evidentiary disclosures[5] directly from alleged victims or witnesses whenever hearsay comes to light that suggests a potentially significant ground for investigating their credibility. But we believe, particularly where, as here, the Legislature has carefully crafted an evidentiary privilege for mental health patients and their records (e.g., Evid. Code, §§ 1012, 1014), that the legislative branch appears well suited to address this issue with full consideration of the significant competing rights of victims and the accused.

In sum, we are not persuaded the trial court erred or violated defendant's constitutional rights in refusing to order the People to obtain and disclose information sufficient for the defense to investigate whether psychiatric records of Doe 1 existed and to subpoena them if they did.

## B. Denial of Mistrial Motion

Defendant contends the trial court incorrectly told the jury that defense counsel violated her discovery obligations and violated an in limine ruling. He claims the combination of the court's comments impaired his right to a fair trial such that the court abused its discretion in denying his motion for a mistrial.

---

[5]     The dissent acknowledges the " 'Sixth Amendment right to access protected information does not extend to pretrial disclosure, given the possibility that subsequent developments may eliminate the justification for invading a patient's statutory privilege.' " (Dis. opn. at p. 7, *post*, citing *People v. Nieves*, *supra*, 11 Cal.5th at p. 432.) But the dissent concludes that the ruling at issue did not implicate "pretrial" disclosure because, in its view, the court's addressing of in limine motions meant the trial was underway. (Dis. opn. at p. 8, *post*.) We note the court rendered its ruling before any prospective jury panel was brought in and before any witnesses took the stand. (See *Hammon*, *supra*, 15 Cal.4th at pp. 1127–1128.)

19

### 1. Additional Background

The original complaint alleged counts 1 through 3 occurred on or between March 1, 2014 and March 31, 2014, because Doe 1 initially reported to the police that the approximate date and location of the incident was around March 2014 in defendant's basement residence. At the preliminary hearing, the sole testifying witness was Detective Talley. She testified that Doe 1 reported to her that the incident occurred in the summer of 2014, when he was about 14 years old, at defendant's basement residence. The People thereafter filed an information alleging counts 1 through 3 occurred on or between May 1, 2014 and July 1, 2014. Before trial, the People amended the information to allege the counts occurred on or between May 1, 2014 and August 1, 2014.

Prior to trial, defendant disclosed three witnesses to the prosecution, and during the hearing on the motions in limine, the trial court indicated the defense complied with its obligations to disclose witnesses. The court also ruled impeachment evidence must be disclosed prior to its use on the witness stand, but not much before. Further, the court granted a defense motion in limine requesting the exclusion of testimony that Andrew B. pulled a gun on defendant after Andrew B. found defendant hovering over him while he was sleeping.

Subsequently, during cross-examination of every prosecution witness, the defense asked the witnesses questions about Andrew B. The defense asked about Andrew B.'s presence during or around the time of the alleged molestations of Jane and Doe 2, Andrew B.'s friendship with defendant, and elicited that Andrew B. was around the same age as Doe 1. After eliciting from Detective Talley that defendant associated with Andrew B., the defense asked her, "as part of your sexual assault investigation, you interviewed

Andrew B[.]; correct?" Talley responded, "I did." The defense then asked, "And nothing resulted," to which the People objected on hearsay grounds, and the court sustained the objection, commenting, "Also in violation of an in limine motion, yes. [¶] Next question."

After the People rested their case in chief, and after the trial court denied defendant's motion for acquittal pursuant to section 1118.1, defense counsel indicated she intended to call an impeachment witness that afternoon. Counsel stated she would email the prosecutor the anticipated substance of the witness's testimony and would also disclose some documents.

Once in receipt of the defense's information, the prosecutor argued the alleged impeachment evidence was actually late discovery showing defendant was evicted from the basement residence where the incident involving Doe 1 occurred, and as such, defense counsel must reasonably have anticipated from the outset that she would use such evidence. Because defense counsel had not previously disclosed the eviction evidence, the prosecutor asked for a brief continuance to look at the proffered documents. The court granted the prosecutor's request and informed the jury it would recess the trial for two days because "[t]he defense has turned over . . . some information which was not previously disclosed about the next witness and I'm allowing the District Attorney to review the information and have time to consider how that affects anything at all."

When trial reconvened, defense counsel moved for a mistrial. Maintaining that the evidence concerning defendant's tenancy and eviction was impeachment evidence, defense counsel essentially argued that defendant's right to a fair trial was violated because (1) the court erroneously told the jury that the defense had untimely disclosed evidence and (2) the

21

trial court's evidentiary ruling indicated that the defense had violated the court's ruling on an in limine motion. Meanwhile, the prosecutor moved to exclude the defense's eviction evidence due to the defense's discovery violation, or alternatively to allow the People to call a rebuttal witness or for sanctions.

The trial court denied the defense's mistrial motion. The court observed that defendant knew based on the discovery and preliminary hearing testimony that the incident involving Doe 1 allegedly occurred at defendant's basement residence in the summer of 2014. Thus, in the court's view, the evidence showing defendant had been evicted and did not live there in the summer of 2014 was not mere impeachment evidence, but directly contradicted the People's case. After reiterating that the defense violated its discovery obligations under section 1054.3, the court indicated the challenged comments did not go nearly as far as CALCRIM No. 306,[6] which the court indicated could still be given upon request. As for the court's comment during the defense's questioning of Detective Talley regarding Andrew B., the court explained that defense counsel had violated the court's in limine ruling that excluded any evidence that Andrew B. pulled a gun on defendant, because the clear inference of the defense's question whether Detective Talley talked to Andrew B. during her investigation was that nothing happened between him and defendant.

---

[6] CALCRIM No. 306 is given when there is evidence of a violation of the criminal discovery statutes. (*People v. Riggs* (2008) 44 Cal.4th 248, 306–307.) The instruction permits the jury to consider the effect of that untimely disclosure on the weight and significance of the evidence, but states the failure to timely disclose evidence is not itself evidence the defendant committed a crime.

22

The trial court also denied the prosecution's motion to exclude the defense's eviction evidence, but indicated it would allow the People to call a rebuttal witness. Ultimately, the prosecutor presented no evidence in rebuttal.

### 2. Analysis

To reiterate, defendant complains the trial court incorrectly told the jury that defense counsel violated her discovery obligations, and that defense counsel violated an in limine ruling. Defendant claims the combination of these comments undermined defendant and defense counsel's integrity in front of the jury, impairing his right to a fair trial.

Based on our review of the record, we cannot conclude the trial court's comments drew upon unreasonable inferences from the questioning or were wrong on law. But even assuming, generously, that the court's comments could be regarded as in some way erroneous, such comments did not warrant a mistrial. " ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Harris* (2013) 57 Cal.4th 804, 848.)

Here, when granting the two-day recess after the defense disclosed its eviction-related evidence, the court said to the jury, "Ladies and Gentlemen, I'm going to have to put you on a recess till Monday. The defense has turned over . . . some information which was not previously disclosed about the next witness and I'm allowing the District Attorney to review the information and have time to consider how that affects anything at all." This comment was

23

not "incurably prejudicial" such that a new trial was required. On its face, the remark was neutral, and did not convey that either defendant or defense counsel was at fault or violated their discovery obligations.

Defendant argues the jury would have necessarily understood the defense "had done something wrong," and so the comment invited the jury to punish defendant for his attorney's "malfeasance." This is unsupported by the record. Furthermore, defendant did not request an admonition or instruction, and there is no apparent reason why the claimed prejudice to his and his attorney's integrity could not have been addressed by admonition or instruction.

Next, defendant contends the trial court's comment regarding the in limine violation "conveyed to the jury that defense counsel had violated a judicial ruling" which "made it impossible for [defendant] to receive a fair trial." We disagree. The objection to defense counsel's question about what Andrew B. reported, and the court's comment in sustaining the objection, told the jury the question called for hearsay and the violation of an in limine motion. But contrary to defendant's suggestion, the court's comment did not imply that defense counsel deliberately violated an in limine ruling. And again, any claimed prejudice to his and his attorney's integrity could have been satisfactorily addressed by an admonition, which defendant did not request.

In sum, the challenged comments did not warrant a mistrial, and the trial court did not abuse its discretion in denying one.

## C. Exclusion of Evidence

The trial court excluded evidence that Doe 1 posted "gay jokes" on his Facebook page. Defendant contends this was error, because the evidence was "highly relevant" to Doe 1's credibility and was not otherwise subject to

24

exclusion. Defendant claims this erroneous ruling violated his federal and state rights to confrontation.

### 1. Additional Background

Doe 1 testified he waited years to disclose the incident because he was afraid people might look at him differently or that he would lose friends. At the time, Doe 1's personal image was very important to him. He continued to hang out with defendant because he did not want anyone to question if anything had happened. "Gay jokes," or jokes about anal sex, were often made among Doe 1's friend group, but after the incident, it became very uncomfortable when such jokes were made while defendant was present. During Doe 1's cross-examination, the trial court sustained relevance objections when defense counsel asked whether Doe 1 continued making such jokes online after leaving his friend group, and whether Doe 1's Facebook page contained numerous jokes about anal sex.

At the noon recess, outside the presence of the jury, the defense asserted Doe 1 had relevant Facebook posts concerning anal sex that went "to his credibility as to whether or not he has some sort of infatuation with wanting anal sex" and whether he was fabricating the incident with defendant. The court indicated such evidence was inadmissible under Evidence Code section 782 as evidence of a sexual assault victim's behavior and conduct.

After returning from the recess, the trial court expressed it was extremely troubled by the defense having asked Doe 1 if the alleged sodomy was his "first" time having anal sex. The court believed that the question was meant to insinuate something about Doe 1's sexual orientation, and that defense counsel was "playing up on homophobia" in violation of counsel's ethical duties. Returning to the issue of the Facebook posts, the court

reiterated that admission of the posts was prohibited by Evidence Code section 782 as evidence of a sexual assault victim's behavior and conduct. In response, defense counsel maintained that the evidence of Doe 1's Facebook posts was relevant because, if Doe 1 could make jokes about anal sex, then it made it less likely that Doe 1 was "anally raped." Defense counsel had the Facebook posts marked as an exhibit, though the court ultimately ruled the posts inadmissible.

During re-direct examination, Doe 1 testified he was not proud of his posts or the jokes that defense counsel had asked him about.

The following day, after the People rested, the defense filed a written motion to admit Doe 1's Facebook posts, including some new posts that counsel proposed using. The court denied the motion.

### 2. Legal Standards

In cases where a violation of section 286 is charged, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness." (Evid. Code, § 1103, subd. (c).) Evidence Code section 782 provides a limited exception to this rule, when evidence of the complaining witness's sexual conduct is offered to attack the complaining witness's credibility. (*Id.*, §§ 782, subd. (a), 1103, subd. (c)(5).)

Evidence Code section 782 sets out a procedure for admission of "evidence of the sexual conduct" of a complaining witness in cases where certain sex offenses, including violations of sections 286 and 288, are charged. (Evid. Code, § 782, subds. (a), (c)(1).) For purposes of the statute, " 'evidence of sexual conduct' includes *those portions of a social media account about the complaining witness*, including any text, image, video, or picture, *which*

26

*depict sexual content*, sexual history, nudity or partial nudity, intimate sexual activity, *communications about sex*, sexual fantasies, and *other information that appeals to a prurient interest*, unless it is related to the alleged offense." (*Id.*, § 782, subd. (b)(2), italics added; see *People v. Franklin* (1994) 25 Cal.App.4th 328, 334 [Evidence Code section 782 has been construed broadly to encompass "any behavior that reflects the actor's or speaker's willingness to engage in sexual activity"].)

Evidence Code section 782 requires that a defendant file a written motion "stating that the defense has an offer of proof of the relevance of evidence of the sexual conduct of the complaining witness that is proposed to be presented and of its relevance in attacking the credibility of the complaining witness." (Evid. Code, § 782, subd. (a)(1).)  The motion must be accompanied by an affidavit stating the offer of proof, which must be filed under seal and unsealed only for the court to determine whether to order a further hearing.  (*Id.*, § 782, subd. (a)(2).)  If the court finds the offer of proof sufficient, it must order a hearing outside of the jury's presence and allow questioning of the complaining witness regarding the offer of proof.  (*Id.*, § 782, subd. (a)(3).)  "[I]f the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted." (*Id.*, § 782, subd. (a)(4).)  "The trial court is vested with broad discretion to weigh a defendant's proffered evidence." (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1514.)  An order excluding evidence is reviewed for abuse of discretion.  (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827.)

27

### 3. *Analysis*

Defendant first contends the court erred in excluding the Facebook posts under Evidence Code section 782 because the posts did not amount to "evidence of sexual conduct" under the statute, and the posts were not "about" Doe 1. We disagree.

The Facebook posts at issue consist of images with explicit sexual content, thinly veiled innuendos about sex, text and communications about sex or being homosexual, and other information that appeals to a prurient interest.[7] (Evid. Code, § 782, subd. (b)(2).) Many of the posts are dated to late 2020. The posts reasonably can be understood as being about Doe 1 and depicting sexual content, communications about sex, sexual fantasies, and other information that appeals to a prurient interest. Indeed, the defense argued at trial that the Facebook posts concerning anal sex were relevant to Doe 1's "credibility as to whether or not *he has some sort of infatuation with wanting anal sex.*" (Italics added.)[8] Consequently, we cannot say it was an abuse of discretion for the trial court to find that these Facebook posts fell within Evidence Code section 782's contemplation of "evidence of sexual conduct."

Defendant next contends that if the Facebook posts fell within the scope of Evidence Code section 782, the trial court should have held an evidentiary hearing because defense counsel made a sufficient offer of proof for a hearing under the statute. We reject this.

---

[7]    Among the Facebook posts in the record, some do not appear to be about sex at all. We do not understand defendant's argument to be directed at these posts. We focus on the posts that contain "gay jokes" and jokes about anal sex, which defendant argues bear on Doe 1's credibility.

[8]    Even on appeal, defendant argues the Facebook posts "would have supported a reasonable inference about Doe 1's attitude toward anal sex and a gay sexual orientation."

28

As discussed, a written motion under Evidence Code section 782 must be accompanied by an affidavit describing the defendant's offer of proof. Based on the offer of proof, a trial court may or may not decide to hold a further hearing where the complaining witness can be questioned. (Evid. Code, § 782, subd. (a)(1)–(3).) After making its decision, the court must reseal the affidavit, but if a defendant raises an issue on appeal relating to the offer of proof, "the court shall allow the Attorney General and appellate counsel for the defendant access to the sealed affidavit." (*Id.*, subds. (a)(2), (5).)

Here, defendant argues on appeal that the affidavit stating the offer of proof was sufficient to warrant an evidentiary hearing. But defendant fails to demonstrate reversible error due to his conclusory briefing and lack of any discussion of the contents of the offer of proof. Indeed, it appears the sealed affidavit has not even been lodged with this court. As it is an appellant's burden to show error, we will reject defendant's claim of error without making arguments for him. (*Shaw v. Los Angeles Unified School Dist.* (2023) 95 Cal.App.5th 740, 754.)

That said, based simply on our review of the Facebook posts at issue, we cannot say the trial court abused its discretion in excluding them. Defendant claims the posts were relevant because Doe 1 testified that after the incident with defendant, he became uncomfortable making " 'gay' jokes," or jokes about anal sex, but subsequently posted jokes of this nature. But this is an imprecise characterization of the testimony. On direct examination, Doe 1 testified that after the incident, the dynamic changed when he and defendant hung out: he was no longer comfortable when "gay jokes" were made though it was normal during "guy to guy hanging out" for such jokes to be made. On cross-examination, defendant asked about

whether Doe 1 and defendant were making jokes of this nature around each other. Doe 1 responded, "not as comfortably" and said he stopped making these jokes because he was uncomfortable. But when asked if he ever posted these types of jokes, Doe 1 admitted he did and said, "Otherwise [he] felt it would raise red flags" among his friend group. When further questioned, Doe 1 clarified he was comfortable posting these types of jokes, even though he no longer felt comfortable "touching that subject" around defendant.

Even if the evidence did controvert Doe 1's testimony to some degree, the impeachment would have concerned the collateral issue of Doe 1's candor as to whether he was uncomfortable making "gay jokes" after the incident.[9] Thus, the Facebook posts were also subject to exclusion under Evidence Code section 782, subdivision (a)(4), given the marginal value of the evidence weighed against the dangers of undue prejudice or confusing the issues. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976 [a ruling or decision must be sustained if "right upon any theory of the law applicable to the case"].) Moreover, given the marginal value of the evidence, we would also conclude any perceived error in excluding the Facebook posts was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836), and reject defendant's argument that the exclusion of the Facebook posts violated his Sixth Amendment right to confrontation and was prejudicial under *Chapman v. California* (1967) 386 U.S. 18. (AOB 95-102.)

In sum, defendant has not shown the trial court erred in excluding Doe 1's Facebook posts.

---

[9] We note defendant does not argue on appeal that the trial court abused its discretion in sustaining objections to defense counsel asking Doe 1 whether he continued making "gay jokes" online after leaving his friend group.

### D. Prosecutorial Error

During her closing argument, the prosecutor used PowerPoint slides. The seal of the district attorney's office was on the lower left-hand corner of each slide. The seal consists of a gold band containing the words "District Attorney" and "Contra Costa County" encircling a seven-pointed star. (Capitalization omitted.) In the center of that star is a smaller gold band which contains words which are largely illegible encircling an image of what appears to be a statue holding the scales of justice in front of a pillared building, presumably intended to depict a courthouse.

Defendant contends that by putting the seal of her office on her slides, the prosecutor invoked the prestige of her office to persuade the jury and committed the error of "improper vouching." Defendant contends the trial court compounded the error by not ordering the prosecutor to remove the seal. He claims the error violated his rights to due process and to a fair trial.

" 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]" [Citation.] The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.] ' "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct. [Citation.] Also, a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object *and seek an admonition if an*

31

*objection and jury admonition would have cured the injury.*" ' " (*People v. Young* (2019) 7 Cal.5th 905, 932–933, italics added.) "We review the trial court's rulings on prosecutorial misconduct for abuse of discretion." (*People v. Peoples* (2016) 62 Cal.4th 718, 792–793.)

Though defense counsel objected to the seal on the slides, she did not seek a jury admonition. There is no apparent reason an admonition could not have cured the alleged error. As such, the claim was not properly preserved.

Even if preserved, we would reject it on the merits. " 'Improper vouching occurs when the prosecutor . . . invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) Here, the record does not reasonably reflect an invocation by the prosecutor of her "personal prestige or depth of experience, or the prestige or reputation of the office" in support of any argument. The seal appears in the corner of each slide and, while visible, it is not particularly large. More to the point, it is common knowledge that district attorneys are, in fact, county officers who are generally responsible for prosecuting public offenses and who work in furtherance of the administration of justice. (Gov. Code, §§ 24000, subd. (a), 26500, 26500.5.) Thus, as defendant acknowledges, "everyone did indeed know who the prosecutor worked for." Just as it does not violate due process for the prosecution to refer to itself as " 'the People,' " we see no error in the prosecutor presenting slides that included a relatively small seal of her office. (*People v. Thomas* (2012) 53 Cal.4th 771, 816.) If anything, the seal apparently clarified that the slides were property of the District Attorney and did not reflect the views or positions of the defense.

Additionally, the jurors received instructions that correctly emphasized the prosecution's burden of proving defendant guilty beyond a reasonable

doubt, as well as an instruction cautioning that the closing arguments and questions of the attorneys were not evidence and that only the witnesses' answers to questions are evidence.

On this record, which reflects absolutely no indication that the jurors were either confused or swayed by the presence of the office seal on the prosecutor's slides, we see no basis for relief.

**E. Cumulative Effect**

Defendant contends the cumulative effect of the claimed errors violated his rights to due process. Under the cumulative error doctrine, we reverse the judgment if there is a "reasonable probability" that the jury would have rendered a result more favorable to defendant absent a combination of errors. (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) Here, we have found no error, and no prejudice where we have assumed error.

**F. Subpoenaed Material**

Defendant subpoenaed incident reports related to the three complaining witnesses from the Brentwood Police Department and the Calaveras County Sheriff's Office. The only document in the record addressing the subpoenaed materials in any detail appears to be a minute order dated July 22, 2022 that states, in full: "The matter came on before this court on July 22, 2022, for subpoenaed records disclosure. The defense had subpoenaed incident reports involving the three victims in this case from Brentwood Police Department and Calaveras County Sheriff. Although unstated on the record, the relevance of the subpoenaed records is for impeachment of the victims. Both sides agreed the court should conduct an in camera review of the subpoenaed records. [¶] The court conducted an in camera review of the subpoenaed records which were contained in two sealed manila envelopes. After conducting said review, there are no records to

disclose. In the spirit of full disclosure, the Brentwood records were some of the reports from the underlying charges against the defendant. Once the court realized the reports pertained to the charges involved in this case, the court stopped reviewing them."[10]

Defendant now asks this court to independently review the subpoenaed records to ensure the trial court "properly exercised its discretion and fully protected [defendant's] due process and statutory rights." The People do not oppose the request, but assert that if we find "there are discoverable materials, the appropriate remedy would be to remand the case to the trial court to determine whether appellant was prejudiced by the failure to disclose those materials."

Case law recognizes our authority to independently review the subpoenaed records. (*People v. Dworak* (2021) 11 Cal.5th 881, 912; *People v. Martinez* (2009) 47 Cal.4th 399, 453.) " 'Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable "must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record." ' "[11] (*Dworak*, at p. 912.) We have obtained the records from the superior court and reviewed them.

### 1. *General principles*

"Documents and records in the possession of nonparty witnesses and government agencies other than agents or employees of the prosecutor are

---

[10] The minute order states, in part, "Debra Thompson, CSR (unreported)," which seems to indicate there is no verbatim transcript of the in camera review.

[11] The subpoenaed records are part of the record on appeal but they are sealed (Cal. Rules of Court, rule 8.320), and appellate counsel has not been permitted to view them.

obtainable by subpoena duces tecum." (*People v. Superior Court* (*Barrett*) (2000) 80 Cal.App.4th 1305, 1318, overruled on other grounds in *Touchstone*, *supra*, 10 Cal.5th at p. 345, fn. 6.) "[A] criminal subpoena does not command, or even allow, the recipient to provide materials directly to the requesting party. Instead, under subdivision [(d)] of section 1326, the sought materials must be given to the superior court for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' " (*Touchstone*, at p. 344, italics omitted; see Evid. Code, § 1560, subd. (b).)

To acquire subpoenaed materials a defendant must "must make a showing of good cause—that is, specific facts justifying discovery." (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 256 (*Madrigal*).) "As part of the good cause showing, a defendant has the burden to show a 'plausible justification' for inspection. [Citations.] In assessing whether this burden is satisfied, we consider whether defense counsel has presented 'specific facts demonstrating that the subpoenaed documents are admissible or might lead to admissible evidence' that will reasonably assist counsel in preparing a defense. [Citation.] Furthermore, the documents must be 'requested with adequate specificity to preclude the possibility that defendant is engaging in a "fishing expedition." ' " (*Id.* at p. 257; see *People v. Prince* (2007) 40 Cal.4th 1179, 1232.) "An accused is entitled to any ' "pretrial knowledge of any unprivileged evidence, or information *that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense.*" ' " (*Madrigal*, at pp. 256–257, italics added.)

In *Touchstone*, *supra*, 10 Cal.5th 329, the California Supreme Court set out seven factors (called the "*Alhambra* factors") that "should be considered by a trial court in considering whether good cause has been shown to enforce

a [criminal] subpoena that has been challenged by a motion to quash." (*Touchstone*, at pp. 336, 345–347.)  The first and most prominent factor is whether "the defendant carried his burden of showing a ' "plausible justification" ' for acquiring documents from a third party [citations] by presenting specific facts demonstrating that the subpoenaed documents are admissible or might lead to admissible evidence that will reasonably ' "assist [the defendant] in preparing his defense." ' " (*Id.* at p. 345 & fn. 6.)  For this factor, the defendant need not show that the evidence sought would be admissible at trial.  Rather, " ' "[a] showing . . . that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense." ' " (*Id.* at p. 348, italics omitted.)

The second factor is whether the material sought is "adequately described and not overly broad." (*Touchstone*, *supra*, 10 Cal.5th at p. 346.) The remaining five factors are:  whether production of the materials would violate a third party's privacy or confidentiality rights, or a protected government interest; whether the request is timely; whether the time necessary to produce the materials might unreasonably delay trial; and whether the production of the records would place an unreasonable burden on the third party. (*Id.* at pp. 346–347.)  Importantly, the high court emphasized that "courts should create a record that facilitates meaningful appellate review," which, *at a minimum*, means a court should "articulate orally, and have memorialized in the reporter's transcript, its consideration of the relevant factors." (*Id.* at p. 358.)

Although *Touchstone*, *supra*, 10 Cal.5th 329, was decided in the context of a motion to quash a subpoena, those factors appear properly applied even if no such motion or objection is filed. (See Hoffstadt, California Criminal Discovery (6th ed. 2020) § 13.03, pp. 374–375 (Hoffstadt on Criminal Discovery); *Touchstone*, at pp. 344–345 & fn. 6, 356 [relying on 2015 edition of Hoffstadt on Criminal Discovery].) This is consistent with case law indicating that even if no motion to quash is filed, a defendant must present a plausible justification for inspection and make the request for documents with some specificity. (*Madrigal*, *supra*, 93 Cal.App.5th at pp. 255–257.)

We review discovery orders for abuse of discretion. (*Touchstone*, *supra*, 10 Cal.5th at p. 359.)

### 2. *Did the court err?*

Implicit in defendant's request that we review the subpoenaed records is a claim that the court erred or otherwise abused its discretion in refusing to disclose any of the subpoenaed documents. We turn to assess this claim.

Here, the record is so sparse that we cannot ascertain whether or not the trial court erred. As discussed, the only document in the record addressing the subpoenaed materials in any detail is the minute order dated July 22, 2022. There is no corresponding reporter's transcript, no copy of the subpoena, and no other document that may have been filed in support or in opposition to the subpoena. It is unclear from the minute order whether defense counsel set out a plausible justification for acquiring the documents, or whether counsel described the requested information with any degree of specificity. The minute order simply states that "[a]lthough unstated on the record, the relevance of the subpoenaed records is for impeachment of the victims." In sum, the record falls far short of facilitating meaningful appellate review. (*Touchstone*, *supra*, 10 Cal.5th at p. 358.)

### 3. *Conditional Reversal*

Given the lack of an adequate record, what is the proper remedy?  In *Touchstone*, the high court similarly concluded the trial court abused its discretion in ruling on the motion to quash by failing to apply the seven *Alhambra* factors when making its good cause determination.  (*Touchstone, supra*, 10 Cal.5th at p. 359.)  The court ultimately held that "in light of questions concerning whether the underlying subpoena is supported by good cause," it would "direct the Court of Appeal to vacate the trial court's denial of the motion to quash and instruct the trial court to reconsider that motion." (*Ibid.*; cf. *People v. Gaines* (2009) 46 Cal.4th 172, 176.)

In *Madrigal, supra*, 93 Cal.App.5th 219, the defendant was convicted of first degree murder and second degree robbery.  (*Madrigal*, at p. 236.)  In addition to holding the murder conviction required reversal under Senate Bill No. 1437, *Madrigal* also concluded the trial court abused its discretion by refusing to release or even review records that were subpoenaed by the defendant.  *Madrigal* conditionally reversed the remaining robbery conviction with the following directions:  "On remand, the trial court shall either release the subpoenaed documents to Madrigal or exercise its discretion to review them in camera to determine whether any portion of them must be released. If the trial court releases any portion of the subpoenaed documents, it shall allow Madrigal an opportunity to show prejudice.  If the trial court determines Madrigal was prejudiced by its previous failure to release the documents, the trial court shall order a new trial on count 2, which may be joined with any retrial that may be held on other charges filed in this matter. If the trial court determines no documents must be released based on its in camera review, or that Madrigal was not prejudiced by the failure to release

38

the documents, the trial court shall reinstate the judgment of conviction on the second degree robbery count." (*Id.* at p. 264.)

Taking our cue from *Touchstone* and *Madrigal*, we will conditionally vacate the convictions, and remand the matter to the trial court to reconsider its discovery order. On remand, the court "should create a record that facilitates meaningful appellate review." (*Touchstone*, *supra*, 10 Cal.5th at p. 358.) If the court releases any portion of the subpoenaed documents, it shall allow defendant an opportunity to show prejudice. If the court determines defendant was prejudiced by its previous failure to release any of the documents, the trial court shall order a new trial on all counts or on a particular count, depending on the scope of the prejudice. If the court determines no documents must be released, or that defendant was not prejudiced by the failure to release the documents, the trial court shall reinstate the judgment. (*Madrigal*, *supra*, 93 Cal.App.5th at p. 264.)

### G. Probation Report

Defendant asserts that lines 8 through 10, on page 15 of the probation report, contains a clear misstatement of fact, i.e., it incorrectly states that defendant was convicted of offenses involving three minors. We accept the People's concession of error, as the record is clear the jury convicted defendant of the crimes involving Does 1 and 2, but not Jane. We will thus order the court to correct the error in the event the judgment is reinstated.

Although defendant confines his request to the specific sentence at lines 8 through 10, on page 15, we note that the entire paragraph containing that sentence should be reviewed for accuracy. Additionally, defendant's reply brief observes the first page of the probation report incorrectly indicates he was found guilty of count 5, and asks this also be corrected. Though generally we do not consider claims belatedly raised in a reply brief, for the

sake of efficiency, we will also order the court to correct this clear error if the judgment is reinstated.

## DISPOSITION

The judgment is conditionally reversed, and the cause remanded for the trial court to reconsider its discovery order concerning the subpoenaed incident reports related to the three complaining witnesses from the Brentwood Police Department and Calaveras County Sheriff's Office. On remand, the trial court must create a record that facilitates meaningful appellate review. (*Touchstone*, *supra*, 10 Cal.5th at p. 358 ["a trial court should, at a minimum, articulate orally, and have memorialized in the reporter's transcript, its consideration of the relevant factors"].) If the trial court releases any portion of the subpoenaed documents, it shall allow defendant an opportunity to show prejudice. If the trial court determines defendant was prejudiced by its previous failure to release the documents, the trial court shall order a new trial on all counts or on a particular count, depending on the scope of the prejudice. If the trial court determines no documents must be released, or that defendant was not prejudiced by the failure to release the documents, the trial court shall reinstate the judgment.

If the judgment is reinstated, the court must (i) correct the first full paragraph on page 15 of the probation report, to reflect the accurate number of victims and facts underlying the convictions; and (ii) correct the stated crimes of which defendant was convicted on page 1, line 22, of the probation report.

                                _____

                                Fujisaki, J.

I CONCUR:

_____

Rodríguez, J.

**TUCHER, P. J., Dissenting in Part:**

I would conditionally reverse the judgment for a different reason: because I believe the trial court may have violated defendant's constitutional right to confront John Doe 1 (Doe 1) with evidence relating to his schizophrenia. I conclude the trial court abused its discretion in declining to hold a hearing pursuant to Evidence Code section 402 (a 402 hearing) at which the defense could have ascertained whether Doe 1 had indeed been diagnosed with schizophrenia and could have identified any diagnosing or treating clinicians. A 402 hearing eliciting such evidence would have been an important first step toward allowing the defense to present such evidence to the jury, if warranted, but the trial court prematurely shut down the entire line of inquiry based on its mistaken view that evidence of schizophrenia was not relevant to a witness's credibility.

## BACKGROUND

On the first day of trial, at the beginning of a hearing on in limine motions, defense counsel raised a new issue: a "last minute" email from the prosecutor disclosing that its chief complaining witness had been diagnosed with schizophrenia. The source of this information was Doe 1's sister, Jane Doe (Jane), who did not provide the name of any diagnosing or treating clinician. Because neither Doe 1 nor Jane would speak with the defense, counsel had sought the prosecutor's help in obtaining Doe 1's mental health records, explaining that the diagnosis could be relevant to Doe 1's credibility. The prosecutor had declined to assist, on the theory she had no obligation to "go fishing for third party discovery." The defense thus asked the court to order the prosecutor to get Doe 1's mental health records, if they existed, so the court could review them in camera for impeachment evidence.

1

The trial court disagreed that a schizophrenia diagnosis was relevant to Doe 1's credibility, adding that Jane's statement was hearsay "and she would not be allowed to say that in trial." Defense counsel sought to clarify her theory—that evidence a witness experiences hallucinations or delusions due to a mental health diagnosis would be relevant to the witness's credibility. But the court disputed this logic, opining that credibility is about whether a person is lying, and even if there was proof Doe 1 was schizophrenic that would not show that he "lies at all, or that he lies all the time, or that he lied about this." When defense counsel pointed out that "credibility goes beyond lying" and includes the possibility that Doe 1's testimony was influenced by delusions that were the product of mental illness, the trial court responded that counsel did not even know that Doe 1 suffered from delusions, and counsel had not persuaded the court "that a mere diagnosis, even if there is a diagnosis of schizophrenia, means that a person is by virtue of being schizophrenic walk[ing] around life every single day of his or her life in a state of delusion. There is absolutely no medical research that's going to back that up and . . . that's what I don't buy," the court explained.

Defense counsel objected that the situation put the defense in a "difficult situation" because *if* Doe 1's accusation against defendant was attributable to a mental impairment, the fact that the People chose not to probe further violated the defendant's due process rights. It left the defense with no way to obtain the information from victim-witnesses who refused to talk to the defense. So if "nothing else," defense counsel requested that the court convene a 402 hearing to get more information about Doe 1's state of mind. Counsel said that at such a hearing she would elicit from Doe 1 whether he had a mental health diagnosis and had seen a mental health professional, and that she would then subpoena Doe 1's mental health

2

records so the court could review them in camera. The court denied this request, stating that it did not see any "violation" by the People, and that the defense had failed to "convince" the court that a person with schizophrenia "is always walking around in a state of delusion." The defense would have to show something more for the court to find the issue was "relevant at all," the court concluded. When counsel reiterated she had no way to access more information without medical records, the court responded those records were confidential and the defense was not "getting past 'go' here" in obtaining them, as the trial court did not "see that they're relevant."

Counsel then inquired whether the court's ruling was final, to which the court responded: "My ruling is based on what you've said now, I don't see any relevance. If somehow you provide legal authority [¶] . . . [¶] that a mere diagnosis of some mental health disorder means that the person is walking around daily in a state of delusion, I'll consider it." Of course, defendant produced no such authority for the counterfactual proposition—that a "mere diagnosis" of schizophrenia equated to a perpetual state of delusion—so defendant was never in position to ask the court to revisit its otherwise final ruling, that evidence of Doe 1's schizophrenia was not relevant to the proceedings and the defense was not "getting past 'go' " in its effort to obtain Doe 1's confidential medical records.

## ANALYSIS

Defendant contends the trial court's ruling impaired his state and federal constitutional rights to confront witnesses and to compulsory process. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) In reviewing this claim, the majority limits its discussion to whether the court erred by refusing to order the prosecution to obtain Doe 1's medical records. But defendant's challenge to the trial court's ruling is broader. He describes the

3

court's error as "declining to take *appropriate steps* to order disclosure of information needed to obtain Doe 1's psychiatric records so that it could review them in camera." (Italics added.) One such appropriate step, I believe, would have been to order Doe 1 to appear at a brief 402 hearing. The trial court summarily denied this request, along with the defense request that it order the prosecution to obtain Doe 1's medical records, for a single reason: it found that a witness's diagnosis of schizophrenia is irrelevant to issues of credibility. This was the court's first material mistake and the inception of its potentially prejudicial error.

"Of course, the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592 (*Gurule*).) To impeach a witness's credibility on this ground, there must be evidence not just that the witness has a mental health condition but that the condition affects the witness's ability to perceive, recollect or communicate. (*People v. Hamilton* (2009) 45 Cal.4th 863, 919.) Assessing the relationship between mental illness and credibility is not a categorical exercise. "[M]any people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' " (*People v. Anderson* (2001) 25 Cal.4th 543, 579 (*Anderson*).) However, a mental illness "that causes hallucinations or delusions is generally more probative of credibility than a condition causing only depression, irritability, impulsivity, or anxiety." (*Id*. at p. 609 (conc. opn. of Kennard, J.).) Our high court has recognized, as the majority acknowledges, that "the veracity of someone 'with a psychosis such as paranoid

4

schizophrenia may be impaired by distortions in his ability to perceive and recall events; a schizophrenic who suffers delusions and hallucinations may have difficulty distinguishing fact from fantasy.' " (Maj. opn. *ante*, at pp. 16–17, citing *People v. Reber* (1986) 177 Cal.App.3d 523, 530 (*Reber*), overruled in part by *People v. Hammon* (1997) 15 Cal.4th 1117, 1123–1124 (*Hammon*).)

At the outset of defendant's trial, the court did not have enough information to evaluate whether Doe 1's mental health impacted his ability to perceive, recall or describe the events in question. It did not know whether Jane's disclosure about her brother's diagnosis was true, nor did it have any information about the symptoms or severity of any mental illness Doe 1 might have. This was not a pretrial discovery problem, and defendant did not accuse the prosecutor of wrongfully withholding evidence. Instead, defense counsel suggested two methods to address the import of Jane's last-minute disclosure that potentially impugned her brother's credibility. In my view, one of counsel's proposals was clearly a proper course of action.

Section 402 provides: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ." The purpose of a section 402 hearing "is to decide preliminary questions of fact upon which the admissibility of evidence depends." (*People v. Superior Court* (*Blakely*) (1997) 60 Cal.App.4th 202, 209, fn. 6.)

Here, the preliminary question of fact to be determined by way of a 402 hearing was whether Doe 1 suffered delusions or otherwise had difficulty distinguishing fact from fantasy as a result of mental illness, specifically schizophrenia. If he did, then defendant had a right to elicit that evidence before the jury to impeach Doe 1's testimony. If, on the other hand, mental

5

illness did not affect Doe 1's ability to perceive, recall or describe events, then the defense might properly be prevented from delving into the topic on cross-examination. (*Gurule, supra*, 28 Cal.4th at pp. 591–592; see also *Anderson, supra*, 25 Cal.4th at p. 609 (conc. opn. of Kennard, J.).) Given the prosecutor's unwillingness to ask her witnesses for further information about Doe 1's mental health, the most direct way to answer the preliminary question of fact would have been to put Doe 1 on the witness stand and ask him. And to enable the defense to test Doe 1's answers against information contained in his mental health records, the defense should have been allowed also to ask the identity of Doe 1's mental health provider(s) so that, after defendant had served them with subpoena(s) duces tecum, the court could review responsive records for potentially impeaching information.[1]

The information the defense sought was privileged, but that privilege should have been balanced against the defendant's right to test the veracity of his accuser. The California Constitution recognizes a right to privacy, which has been applied to a person's medical information. (*John B. v.*

---

[1]    Defendant's request was to examine Doe 1 as to whether he had been diagnosed with schizophrenia and received treatment for it, so that defendant could "get those records" for the court's in camera review. It is possible that at a 402 hearing other witnesses (e.g., Jane or a parent) could have supplied the same information, sparing Doe 1 from having to testify. Although the trial court was adamant that Jane not testify at trial as to hearsay regarding Doe 1's diagnosis, it did not consider whether she could testify at a 402 hearing to a disclosure by Doe 1 for the nonhearsay purpose of establishing he had waived an applicable privilege. (See Evid. Code, § 912.) Also possible is that, if the trial court had issued an order requiring Doe 1 to appear at a 402 hearing, the prosecutor would have reconsidered voluntarily supplying the requested information so as to avoid bringing Doe 1 to court. The point is, although I believe the trial court erred in denying the requested 402 hearing under the circumstances, I am not suggesting that granting the request for a hearing would necessarily have required Doe 1 to testify at it.

6

*Superior Court* (2006) 38 Cal.4th 1177, 1198; see Cal. Const, Art. 1, § 1.)  And a statutory privilege protects confidential communications between a patient and his psychotherapist, "includ[ing] a diagnosis made."  (Evid. Code, § 1012; see also § 1014.)  A person does not lose these privacy rights by accusing a defendant of a crime, but the privilege may be overridden when necessary to ensure the defendant's constitutional right to confrontation.  (*Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1295 (*Susan S.*).)  "When a defendant proposes to impeach a critical prosecution witness with privileged information, the trial court may be called upon to balance the defendant's rights under the Sixth Amendment to access such material at trial against the state policies supporting the privilege."  (*People v. Nieves* (2021) 11 Cal.5th 404, 432 (*Nieves*), citing *Davis v. Alaska* (1974) 415 U.S. 308, 319 (*Davis*).)  Here, the defense sought a 402 hearing to elicit information that was likely privileged—whether Doe 1 had been diagnosed with schizophrenia and by whom.  It intended to use this information to subpoena privileged medical records for the court's review.  A 402 hearing would have put the court in position to determine, presumably a few days after the hearing, whether good cause existed for disclosing to the defense confidential information in these medical records.

Because confrontation is a trial right, it cannot be invoked to compel discovery of a witness's confidential medical records before trial.  (*Hammon, supra,* 15 Cal.4th at pp. 1123–1124, overruling in part, *Reber, supra,* 177 Cal.App.3d 523.)  The California Supreme Court has found that the "Sixth Amendment right to access protected information does not extend to pretrial disclosure, given the possibility that subsequent developments may eliminate the justification for invading a patient's statutory privilege."  (*Nieves, supra,* 11 Cal.5th at p. 432, citing *Hammon,* at p. 1127.)  Here, however, we are

called upon to review a ruling that was made on the first day of trial, not pretrial. The fact that trial had already begun is memorialized in the superior court's minute order for the day, which describes the proceedings as "Jury Trial-Day 1." And we can reasonably say trial was "in progress" when the defense requested the 402 hearing, as the case had "been called for trial by a judge who was "available and ready to try the case to conclusion," the court had "committed its resources to the trial," and the parties were "ready to proceed." (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 835–836.) Immediately after ruling on the defense request, the trial court addressed other in limine motions and then began selecting a jury.[2]

The requested 402 hearing would have enabled the court to make an informed decision as to whether there was evidence Doe 1's mental health status affected his ability to perceive, recall or describe events. The court would have better understood whether Doe 1 had, in fact, been diagnosed with schizophrenia. (See e.g. *People v. Gonzales* (2019) 34 Cal.App.5th 1081, 1090–1091 [testimony by brother of prosecution witness that his sister "might be bipolar or delusional" was properly excluded after section 402 hearing showed brother's testimony was speculative].) And court and counsel would have learned whether confidential mental health records existed and where they could be obtained, so the court could review them in camera to determine whether there was good cause for their disclosure. (See *Susan S.,*

---

[2]     Our Supreme Court has recognized there is no single definition of when trial begins; context matters. (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 777.) The natural time to address whether counsel can receive privileged information for purposes of cross-examining a trial witness—here, whether the defense can ask Doe 1 a few questions about a potential schizophrenia diagnosis—would seem to be during motions in limine before jury selection begins. Regardless, the trial court did not reject defendant's request as premature but denied it on the merits.

8

*supra,* 55 Cal.App.4th at pp. 1295–1296.)  The majority acknowledges that, "had the defense actually subpoenaed Doe 1's mental health records—the *Reber-Hammon* line of cases would have required the trial court . . . to review those records in camera and properly balance defendant's need for cross-examination against the state policies the privilege is intended to serve." (Maj. opn. *ante*, at p. 17.)  Here "there were no medical records for the trial court to examine" (*ibid.*), but that was *only* because the trial court prevented the defense from taking the predicate step of asking Doe 1 whether and where he had been diagnosed with, or treated for, schizophrenia.  A 402 hearing would have afforded the defense the opportunity to elicit those facts. Then, armed with the information learned during and as a result of the hearing, the trial court could have made an informed decision about whether to allow Doe 1 to be cross-examined in front of the jury on his mental health under the rule articulated in *Gurule*.  (See *Gurule*, *supra*, 28 Cal.4th at p. 592 ["witness may be cross-examined" if "illness affects the witness's ability to perceive, recall, or describe" events].)  Instead, the trial court made an uninformed and legally erroneous decision that evidence of Doe 1's schizophrenia was irrelevant to his credibility.

The decision whether to hold a 402 hearing is an evidentiary ruling, subject to review for abuse of discretion.  (*People v. Williams* (1997) 16 Cal.4th 153, 197.)  However, "when a trial court's decision rests on an error of law, that decision is an abuse of discretion."  (*People v. Superior Court* (*Humberto S.*) 43 Cal.4th 737, 746; see *People v. Grimes* (2016) 1 Cal.5th 698, 712, fn. 4 [abuse of discretion standard not intended " 'to insulate legal errors from appellate review' "].)  Unfortunately, that is what happened here.  The trial court refused to hold the hearing based on its patently erroneous view

9

that, even if Doe 1 had been diagnosed with schizophrenia, that fact was not relevant to his credibility.

The majority does not defend this error of law (Maj. opn. *ante*, at p. 18), but argues we need not reach it. I disagree.

My colleagues contend defendant has not raised the issue on appeal, quoting one introductory sentence from the appellant's opening brief that is indeed specific to his trial counsel's request for an order directed to the prosecutor. (Maj. opn. *ante*, at p. 18.) But the argument headings make no mention of an order directed to the prosecutor. Instead, as the majority acknowledges (*id.* at p. 7), defendant frames the issue before us in broader terms, stating in his opening brief, "Whether the court below struck the proper balance [between Doe 1's right to privacy and defendant's right to cross-examine] is the question presented here." This formulation is agnostic as to the method for getting the defense the information about Doe 1's schizophrenia that it sought. Appellate counsel goes on to characterize the case law as establishing "the court erred by declining to take appropriate steps to order disclosure of information," again with no suggestion that the only "appropriate step[]" would have been an order directed to the prosecutor. Counsel also relies on a civil case, where no prosecutor would have been present, for the proposition that the trial court should have "follow[ed] the four-step procedure outlined in *Reber*." (Citing *Susan S., supra,* 55 Cal.App.4th at pp. 1295–1296 [on showing of good cause, "trial court should (1) obtain the records and review them in camera. . ."].) Finally, counsel wraps up with a summary of his argument: the trial court infringed defendant's constitutional rights "[b]y failing to properly facilitate the initial

disclosure of information," again silent as to how the court should have accomplished this goal.[3]

No doubt it would have been helpful if appellate counsel had directly addressed why a 402 hearing, in particular, would have been an appropriate procedural device here, but defendant's argument on appeal does respond directly to the error the trial court actually made. Defendant's appellate briefing sets forth that defense counsel "urged the court to allow her 'to probe the witness with regards to his credibility as to whether or not he's making this up or had some sort of delusions about it,' " and specifically asked the court to convene a 402 hearing if it was unwilling to order the prosecutor to obtain the requested information. The court's response was that the defense theory went " 'against logic' " and was " 'the height of speculation.' " When the court refused the requested 402 hearing, its stated reason had nothing to do with the timing of the request, the sufficiency of the defense's showing that it had no other method for obtaining the information, or the court's reluctance to bring Doe 1 into court more than once. Therefore, defendant does not address these issues on appeal. Instead, the trial court opined that Doe 1's reported schizophrenia was not relevant, the records being sought were confidential, and thus defendant was not "getting past 'go' " in obtaining

---

[3]     Like the prosecutor at trial, the Attorney General relies heavily on the limits of the People's disclosure obligations under *Brady*, and in response defendant's reply brief focuses to some extent on arguments that the prosecutor should have obtained Doe 1's medical records. But even on reply, defendant frames the issue broadly—as whether "the trial court erred by not ordering disclosure of sufficient information to allow the defense to ascertain the existence of [Doe 1's] psychiatric records and subpoena them for the purpose of in camera review"—and addresses issues that pertain to both forms of relief that were requested by his trial counsel and denied by the trial court .

11

them.  This is the error defendant addresses and, in my view, convincingly demonstrates.

My colleagues suggest defendant's constitutional right to confront Doe 1 was not violated because defendant did not try to cross-examine him about his mental health before the jury.  (Maj. opn. *ante*, at pp. 17–18.)  They go so far as to assert, "there is no reason to believe the court would have foreclosed the defense from cross-examining Doe 1 on the stand about his mental health in an effort to show its relevance to his credibility."  (Maj. opn. *ante*, at p. 17.)  The problem with this theory is that the court *did* foreclose the defense from cross-examining Doe 1 on the stand about his mental health in an effort to establish its relevance to his credibility.  That is precisely the ruling defendant here appeals—that the defense could not, at a 402 hearing, elicit testimony from Doe 1 as to whether he had been diagnosed with schizophrenia, or ask related questions about his mental health.

The defense asserted its right "to probe the witness with regards to" whether his account of the crime was the result of delusion, and a 402 hearing would have given the trial court the information it needed to strike the appropriate balance between Doe 1's privacy interests and defendant's right to confront Doe 1 with his mental health history.  I struggle to see how it would have been preferable for the defense to raise this topic before the jury in the first instance.  But certainly in this case, where the trial court had already ruled that the subject of Doe 1's schizophrenia was not "relevant at all," I cannot agree that defendant failed to preserve, or fatally undermined, his constitutional claim by failing to raise the issue before the jury.  To so hold is to encourage defendants to challenge court rulings in order to avoid forfeiting their appellate rights.  (Cf. *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [properly directed and ruled upon motion in limine preserves challenge

to erroneous admission of evidence].)[4]  Although the majority characterizes the trial court as having "left the door open for the defense" to re-raise the issue (Maj. opn. *ante,* at p. 7), that is true only in the narrow and formal sense that the trial court agreed it would consider "legal authority" for a non-existent proposition, "that a mere diagnosis of some mental health disorder means that the person is walking around daily in a state of delusion."  In all other respects, the trial court stated its ruling was final.  In my view, the issue was adequately preserved and appropriately placed before this court.

Having concluded that the trial court abused its discretion in denying defendant's request for a 402 hearing, I must address issues of prejudice and remedy.  At the outset, I note that when the trial court cut off any inquiry into Doe 1's schizophrenia diagnosis, it necessarily implicated defendant's right to cross-examine the primary witness against him.  Thus, as defendant argues to this court, his constitutional confrontation rights were squarely at issue (citing *Davis, supra,* 415 U.S. at pp. 315–316; *Anderson, supra,* 25 Cal.4th at p. 608 (conc. opn. of Kennard, J.)),[5] and we must assess prejudice

---

[4]  Because the court's ruling effectively excluded evidence of Doe 1's schizophrenia, it seems especially inappropriate to place the burden on defendant to raise the issue again.  (See Evid. Code, § 354 [evidentiary challenge preserved where "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court," or "[t]he rulings of the court made" such disclosure futile].)  Here, the record shows defendant raised a discrete evidentiary issue and requested a 402 hearing to afford the court sufficient context to address the matter, but the court rejected that request based on an error of law.

[5]  The majority asks what "logical limiting principle" cabins my view that a 402 hearing would have been appropriate in this case.  (Maj. opn. *ante,* at pp. 18–19.)  In response I, too, would cite *Davis, supra,* 415 U.S. 308, together with California cases that rely on it for the proposition that, "[w]hen a defendant proposes to impeach a critical prosecution witness with privileged information, the trial court may be called upon to balance the defendant's

13

under *Chapman v. California* (1967) 386 U.S. 18, 24. (See e.g. *People v. Roberts* (2021) 65 Cal.App.5th 469, 478–479.)

The People argue any error was harmless beyond a reasonable doubt because Doe 1 was a credible witness. However, we have no way of knowing what evidence a 402 hearing would have unearthed or what impact such evidence would have had on Doe 1's credibility. We cannot rule out that "a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted." (*Anderson*, at p. 608 (conc. opn. of Kennard, J.).) In other words, we cannot rule out that the error was prejudicial. The judgment must accordingly be vacated.

On the other hand, it is possible that on remand, after the trial court holds a 402 hearing and reviews any mental health records subpoenaed as a result, the court will decide that Doe 1 should not be cross-examined in front of the jury on the subject of his mental health. Such a ruling could be proper if the evidence was that Doe 1 was never diagnosed with schizophrenia, or that any symptoms he experienced did not interfere with his ability to perceive, recall, or describe events accurately. (See *Gurule, supra*, 28 Cal.4th at pp. 591–592; *People v. Murillo* (2014) 231 Cal.App.4th 448, 457 [402 hearing enables trial court to limit cross-examination to "prevent the revelation of unduly prejudicial facts"].) In this circumstance, there would be no need to empanel another jury to retry the case. The original jury verdicts could be reinstated.

---

rights under the Sixth Amendment . . . against the state policies supporting that privilege." (*Nieves, supra*, 11 Cal.5th at 432.) The circumstances in which I contend a 402 hearing may be necessary are those in which the trial court does not otherwise have the information it needs properly to assess this balance.

Faced with these competing possibilities, I would conditionally reverse the judgment and remand the cause for the trial court to conduct a 402 hearing into Doe 1's reported schizophrenia diagnosis.[6] At the conclusion of such a hearing, and after reviewing any mental health records subpoenaed as a result of it, the trial court would decide in the first instance whether cross-examination into Doe 1's mental health should be allowed at trial and, if so, whether the court's previous refusal to allow the defense to inquire into Doe 1's mental health was prejudicial. If no cross-examination would be allowed, then the trial court would reinstate the jury verdicts. If some cross-examination would be allowed, but the trial court determines beyond a reasonable doubt that such cross-examination would not have affected the original jury's verdict(s),[7] then the trial court would likewise reinstate the original verdict(s). Otherwise, the trial court would proceed with the new trial, empaneling a new jury to hear the evidence against defendant.

TUCHER, P. J.

---

[6] This is the only condition I would place on reversal. With regard to defendant's separate claim that the trial court erred in reviewing subpoenaed law enforcement records pertaining to the complaining witnesses, I think defendant's failure to include in the appellate record a copy of the subpoena and the reporter's transcript of the hearing in which the trial court declined to enforce it is fatal to his claim. Without a transcript, we do not know whether the trial court articulated, and "memorialized in the reporter's transcript, its consideration of the relevant factors." (*Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 358; see also *People v. Whalen* (2013) 56 Cal.4th 1, 85 [claim of error rejected where appellant failed to carry "burden to present a record adequate for review and to affirmatively demonstrate error"].)

[7] The trial court would make this determination separately for each of counts 1 through 4, recognizing that the complaining witness in count 4 is Doe 1's little brother.

Trial Court:      Contra Costa County Superior Court

Trial Judge:     Hon. Terri A. Mockler

Counsel:         Steven Schorr, under appointment by Court of Appeal, for
                 Defendant and Appellant.

                 Rob Bonta, Attorney General, Lance E. Winters, Chief
                 Assistant Attorney General, Jeffrey M. Laurence,
                 Assistant Attorney General, Bridget Billeter and Julia
                 Y. Je, Deputy Attorneys General, for Plaintiff and
                 Respondent.

*People v. Baugh* (A166277)

1